2020 PA Super 158

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOSE JAVIER DEJESUS | : | |
| | : | |
| Appellant | : | No. 883 EDA 2018 |

Appeal from the Judgment of Sentence January 5, 2018

In the Court of Common Pleas of Delaware County Criminal Division at No(s): CP-23-CR-0001277-1997

BEFORE: OLSON, J., DUBOW, J., and STEVENS, P.J.E.*

OPINION BY STEVENS, P.J.E.: **FILED JULY 06, 2020**

Appellant, Jose Javier DeJesus, appeals from the judgment of sentence entered in the Court of Common Pleas of Delaware County on January 5, 2018, as made final by the denial of Appellant's post-sentence motion on February 16, 2018. At issue is whether the trial court properly resentenced Appellant to serve a term of life in prison without the possibility of parole (hereinafter "LWOP") for a murder Appellant committed when he was a juvenile. Following a careful review, we affirm.

The trial court thoroughly summarized the facts underlying Appellant's convictions as follows:

---

* Former Justice specially assigned to the Superior Court.

On or about April 16, 1997, [Appellant] was arrested and charged with murder [and various other crimes]. . . . The events leading up to the arrest and conviction of [Appellant] occurred on May 20, 1994[, when Appellant was 17 years old].  On that date, [Raymond McKinley drove his vehicle to Chester, Pennsylvania,] . . . in the vicinity of Green and McIlvan [S]treets, near the Spanish-American Club. [Raymond's brother, Thomas McKinley, sat in the passenger seat of the vehicle.]

Jabriel Soto, a Puerto Rican male who sold cocaine in the area that day, testified that he had previously sold drugs to Raymond McKinley and considered Raymond a regular customer.  Jabriel Soto stated that on the day in question, [he] saw Appellant talking to Raymond McKinley.  After [] Soto witnessed Appellant walk away from the McKinley vehicle, Soto approached the car and completed a drug sale. Police later recovered two plastic bags from the car containing white powder that lab tests confirmed was cocaine.

Jabriel Soto testified that even though Appellant was not a regular drug dealer, earlier in the day Appellant had said, "nobody's going to make any sales today."  Soto further testified that[, after Soto completed his drug sale with Raymond,] Appellant came up with a gun and pointed it towards [Raymond]. . . . Soto [testified] that Appellant said, "give me the money" and that Appellant "was like robbing" [Raymond].  Thomas McKinley, from his vantage inside the vehicle, recalled seeing Appellant pull a gun from beneath his shirt and say, "give it up[."]

Raymond McKinley [did not give] up any money or drugs. Instead, Raymond McKinley reached outside the car window and attempted to wrestle the gun away from Appellant. However, [] Appellant maintained control of the gun, reached into the car window and shot Raymond McKinley in the neck[.]

Both Thomas McKinley and [] Soto identified the shooter as [] Appellant and described the weapon as a revolver.  Soto specifically described the gun as a ".38 long nose."  Police recovered a single .38 caliber bullet from the vehicle that

forensic firearm analysis indicated had been fired from a revolver.

Thomas McKinley recalled that after the first shot, his brother pulled the car down McIlvan [S]treet. Soto testified that Appellant kept shooting even as the car accelerated, firing a total of two or three shots. One of these shots shattered the driver's side rear wing window of the McKinley vehicle[.]

After hearing the second or third shot, Thomas McKinley felt a stinging pain in his hand. Thereafter, the car struck a building, the Spanish-American Club. [] Soto further testified that once the shots ended, Appellant looked at him, grinned, then ran off[.]

When Thomas McKinley finally exited the vehicle, he noticed that he had blood on him. He testified that the blood was probably from where he had been glanced by the bullet[.]

Police and paramedics ultimately arrived on the scene and transported the McKinley brothers by ambulance to [Crozer-Chester] Hospital.

Thomas McKinley was treated [for a hand wound and released]. . . . Raymond McKinley arrived at [Crozer-Chester] Hospital at 3:05 p.m., critically injured and in profound shock. Dr. [Donald] DeSantis, who ran the trauma program, indicated that Raymond McKinley had gunshot wounds of the neck and shoulder. Raymond McKinley's spinal cord had been essentially destroyed at the level of the fourth or fifth vertebrae. As a result, Raymond McKinley was rendered quadriplegic, unable to move or sense his arms and legs, move his bladder or bowels, swallow, or breath[e] without a respirator. Raymond McKinley was never able to come off a respirator. He never went home after the shooting and ultimately died in a nursing home [approximately two-and-a-half years after the shooting,] on January 29, 1997[.]

Dr. DeSantis noted that the life expectancy of a quadriplegic in Raymond McKinley's condition is approximately three years due to the susceptibility of such individuals to infections. When the doctor examined Raymond McKinley on [May 20, 1994,] there were no indications of respiratory

infection. Thereafter, Raymond McKinley suffered on and off from chronic lung infections until his death.

Dr. [Dimitri] Contostavolos, the medical examiner of Delaware County, performed the autopsy on Raymond McKinley. The doctor testified . . . that [Raymond's] cause of death was infection and respiratory insufficiency resulting from complications of longstanding [respirator-dependent] quadriplegia due to the gunshot wound to the neck. . . . Based on his autopsy and review of Raymond McKinley's records [] the doctor testified to a reasonable degree of medical certainty that the manner of death was homicide.

Trial Court Opinion, 8/26/98, at 1-6 (citations and some capitalization omitted).

The jury found Appellant guilty of Second-Degree Murder, Robbery, Carrying a Firearm without a License, and two counts of Aggravated Assault.[1] On January 27, 1998, the trial court sentenced Appellant to serve the then-mandatory term of LWOP for his Second-Degree Murder conviction along with a consecutive term of twelve (12) to sixty (60) months in prison for his Aggravated Assault conviction related to Thomas McKinley.[2] **See** 18 Pa.C.S.A. § 1102(b) (superseded as to juvenile offenders by 18 Pa.C.S.A. § 1102.1 (effective October 25, 2012)); **see also** 61 Pa.C.S.A. § 6137(a)(1) (declaring that the Pennsylvania Parole Board may not parole an inmate serving a term of life in prison).

---

[1] 18 Pa.C.S.A. §§ 2502(b); 3701(a)(1)(ii); 6106(a); 2702(a)(1); and 2702(a)(4), respectively.

[2] The trial court also sentenced Appellant to serve a concurrent term of six (6) months to twelve (12) months in prison for unlicensed possession of a firearm.

This Court affirmed Appellant's judgment of sentence on March 22, 1999, and Appellant did not file a petition for allowance of appeal with the Pennsylvania Supreme Court. **Commonwealth v. DeJesus**, ____ A.2d ____, 1509 PHL 1998 (Pa.Super. 1999) (unpublished memorandum) at 1-3.

On June 25, 2012, the United States Supreme Court decided **Miller v. Alabama**, 567 U.S. 460, 465 (2012) wherein the High Court held that a mandatory sentence of "life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" **Id**. at 465 (2012). On January 25, 2016, the United States Supreme Court decided **Montgomery v. Louisiana**, 136 S.Ct. 718, 732 (2016) wherein it extended the **Miller** decision and held that "**Miller** announced a substantive rule that is retroactive in cases on collateral review."[3]

On February 25, 2016, Appellant filed the instant petition under the PCRA, *pro se*. Therein, he claimed he was entitled to relief pursuant to **Miller** and **Montgomery**, as he was under the age of eighteen when he committed the murder and had received a mandatory term of LWOP for his crime. **See** Appellant's *Pro Se* PCRA Petition, 2/25/16, at 1-9. On March 21, 2016, counsel

---

[3] In **Commonwealth v. Secreti**, 134 A.3d 77 (Pa.Super. 2016) this Court held that **Montgomery** made **Miller** retroactive for the purpose of reviewing illegal sentences where a juvenile has been subjected to a mandatory life sentence. Moreover, **Secreti** held the January 27, 2016, **Montgomery** decision would control for purposes of the then-sixty-day rule in Section 9545(b)(2) of the PCRA"), 42 Pa.C.S.A. §§ 9541-9546.

entered his appearance on behalf of Appellant and filed an amended petition. Amended PCRA Petition, 3/21/16, at 1-7. The amended petition clarified Appellant's request for relief pursuant to **Miller** and **Montgomery**. **See id.**

On June 5, 2017, after Appellant produced his official birth certificate and proved that he was seventeen years old at the time of the murder, the PCRA court granted Appellant post-conviction collateral relief. Specifically, the PCRA court vacated Appellant's sentences and ordered resentencing for a later date. **See** PCRA Court Order, 6/5/17, at 1.

On July 17, 2018, the Commonwealth filed a Notice of Intent to Seek Imposition of a Life Sentence. The Commonwealth provided its Notice in consideration of 18 Pa. C.S. §1102.1, **Commonwealth v. Batts**, 640 Pa. 401, 163 A.3d 10 (2017) (**Batts II**), and of the factors and evidence to be presented at the resentencing hearing.

Appellant's resentencing hearing was held on December 5th and 6th, 2017. At the outset of the hearing, the parties agreed that Appellant was born on October 4, 1976. N.T. Resentencing Hearing, 12/5/17, at 11. Thus, Appellant was 17 years, seven months, and 16 days old at the time of the May 20, 1994, murder and 41 years old at the time of the resentencing hearing. During the hearing, the Commonwealth presented evidence demonstrating that prison authorities had filed approximately fifty (50) misconduct reports against Appellant throughout the time he had been imprisoned for second-degree murder. **Id.** at 216. These misconduct reports were filed between

March 6, 1998, and July 4, 2017. *See id.* at 219-262. Many of the reports charged Appellant with violating prison regulations, such as refusing to obey an order or using abusive or obscene language toward an employee; however, the Commonwealth presented several instances of Appellant's criminal conduct while in prison.

The most egregious criminal conduct occurred on February 12, 2012, at which time Appellant stabbed another inmate in the face with a toothbrush he had filed down into a "shiv," resulting in serious injury to that inmate. *Id.* at 244-247 and 269. This unprovoked assault occurred in the prison dining hall and was captured on video. *Id.* at 244-247. In response to the stabbing, the prison security department interviewed Appellant. During the interview, "[Appellant] stated he assaulted [the inmate] because [the inmate] was a child molester and [Appellant] stated he hated the thought that he didn't kill him, but [that when Appellant] get[s] out of the [restrictive housing unit, 'I will']." *Id.* at 269-270. Because of "the serious nature of the assault, [and Appellant's] statement[] that he would kill [the inmate] if [let] out of the [restrictive housing unit]," the prison recommended that Appellant be transferred to another institution. *Id.* at 270.

The Commonwealth also introduced evidence that on three separate occasions Appellant "squirted a [shampoo] bottle [filled with] urine [and feces]" at inmates or prison employees. *Id.* at 47-112. These instances occurred on October 17, 2012, November 14, 2014, and January 19, 2016.

The October 17, 2012, action resulted in Appellant's criminal conviction for aggravated harassment, a felony of the third degree. *Id.* at 53-54. Also, on September 7, 2012, a corrections officer filed a misconduct report against Appellant after the officer found a shampoo bottle in Appellant's unit that contained "a brown semi-liquid that had the very, very strong odor of feces." N.T. Resentencing Hearing, 12/5/17, at 32. During the misconduct hearing, Appellant told the examiners "I wasn't going to use it on staff, I had gang problems." *Id.* at 40.

Evidence also was presented that Appellant repeatedly sexually harassed multiple female prison staff members – including by masturbating in their presence – and had been involved in multiple fights and assaults while in prison. *Id.* at 219-262. For example, in November of 2016, about a year before his resentencing, Appellant exposed himself and masturbated when a female mental health worker met with him in his cell. *Id*. at 304-306. In February of 2017, Appellant received another misconduct for sexual harassment as a result of his continuing to follow a female employee around the day room and telling her she was pretty. *Id*. at 260-261, 270-271. The SCI records indicate the Department of Corrections was forced to move Appellant from one facility to another four times throughout his imprisonment due to his behavior. *Id*. at 265, 269.

Kevin Lantz, a unit manager for the Pennsylvania Department of Corrections, testified for the Commonwealth. Mr. Lantz stated that Appellant

had been a resident of his housing unit from July of 2014 to July of 2017. *Id.* at 117-118. On July 5, 2017, Mr. Lantz interviewed Appellant because Appellant had been involved in an altercation in the dining hall which resulted in the issuance of a misconduct report against him. *Id.* at 118. Mr. Lantz explained that, during the interview, Appellant told him: "[t]he only way for me to get what I want is to assault somebody in the dining hall." *Id.* at 121.

Mr. Lantz testified that, during the three-year period in which he was acquainted with Appellant, he determined that Appellant is a manipulative, spiteful, and vengeful person. *Id.* at 125-126. In addition, he observed:

> I'm in charge of a housing unit that has approximately 180 inmates that all have some sort of level of mental health history. We have various levels of inmates. In my opinion, [Appellant] is a higher functioning inmate and I've had many conversations with him in the day room. He has repeatedly shown a pattern to me of resenting authority. He believes in fighting the system every chance he gets which is his right, but he resents authority figures.

*Id.* at 126.

Finally, Mr. Lantz explained that Appellant repeatedly asks to be given special privileges and, when those requests are denied, Appellant "acts out." *Id.*

The Commonwealth next presented the testimony of forensic psychologist Dr. William Russell, whom the trial court accepted as an expert in the field of "amenability to treatment and rehabilitation to the community, risk assessment for adults[,] and general psychology." *Id.* at 187, 191. Dr. Russell stated that, in preparation for the resentencing hearing, he reviewed

Appellant's past records, interviewed Appellant on July 27, 2017, and, following the interview, subjected Appellant to psychological testing. *Id.* at 192-195.

Dr. Russell reviewed a psychological and intelligence assessment which Dr. James Rokos had performed upon Appellant on January 12, 1998, shortly after Appellant entered prison. Dr. Russell stated that Dr. Rokos gave Appellant an IQ test and that "[t]he overall score [of this January 12, 1998 test] indicated that [Appellant] was functioning in the borderline between below average and borderline with an IQ of . . . around 78." *Id.* at 213. However, Dr. Russell explained that this IQ test was flawed because the test had been administered in English and Appellant's native language is Spanish. N.T. Resentencing Hearing, 12/6/17, at 70. A subsequent IQ test administered in Spanish resulted in Appellant scoring 91, which is "an average score." N.T. Resentencing Hearing, 12/5/17, at 213.

Dr. Russell related that Dr. Rokos also had performed a personality assessment upon Appellant following which Dr. Rokos concluded: "[Appellant is a] rather egocentric, impulsive young man who was having difficulty communicating, who was experiencing different issues in terms of he said he was hearing voices. He also stated he couldn't understand what the voices were saying, but he also talked about seeing shadows and dots." *Id.* at 214.

During Appellant's time in prison, various psychotherapists and prison officials had recommended that Appellant participate in programs offered by the prison. However, while Appellant "participated and started several

programs [over his years in prison, Appellant] never completed a program other than . . . victim awareness class." ***Id.*** at 215. Appellant failed to complete the various programs because of a "[c]ombination of he didn't want to go any longer, didn't want to participate in the classes[,] and also he was disruptive in several classes." ***Id.***

Regarding Appellant's chronic misbehavior while in prison, Dr. Russell stressed that:

> from the time [Appellant] came into [prison], he has been problematic in terms of behavior, in terms of aggression, in terms of interacting both with staff and corrections officers as well as fellow inmates. . . . From the time he's entered the system through his . . . last placement [at State Correctional Institution (SCI) Albion], it's been a consistent pattern of aggressive, defian[t] behavior.

***Id.*** at 215 and 263.

Further, Dr. Russell noted that, as a result of Appellant's constant misbehavior, Appellant received "a Z classification, which means he cannot be housed in a cell with another inmate," and Appellant has "probably been in restrictive housing 35 to 40 percent [of] the time he's been in the SCI system." ***Id.*** at 264.

During Appellant's time in prison, multiple psychotherapists diagnosed Appellant as suffering from antisocial personality disorder and schizotypal personality disorder. ***Id.*** at 313-339. The psychotherapists prescribed various types of medication for Appellant's mental health problems throughout

his years in prison, yet Appellant consistently has remained noncompliant with taking the medications as prescribed. Dr. Russell observed:

> He's been offered medication since his placement in the SCI system. Those medications are numerous. . . . At different times he's been offered haloperidol, he's been offered benztropine, Navane, melatonin for sleep, which he did take, chlorpromazine, clonidine, risperidone, a variety of antipsychotic medications he's been offered. And at different times, he has taken them for periods of time. . . .
>
> What's very interesting there is that there's been no change in his behavior even when he was taking the medications in terms of his ability to interact and converse and to communicate. But the big concern in terms of looking at [Appellant's] behavior from a risk standpoint is he stops because he doesn't want to take the medication. . . . [He told me that h]e always stopped the medication because he didn't like the dry mouth.

*Id.* at 317-318.

In anticipation of the resentencing hearing, Dr. Russell performed psychological testing on Appellant and, like many of Appellant's prior psychotherapists, Dr. Russell also diagnosed Appellant as suffering from antisocial personality disorder and schizotypal personality disorder. *Id.* at 350. Dr. Russell explained the reasons for his diagnoses as follows:

> Personality is the way we think, we feel, we behave. It's part of our genetics, it's part of our upbringing, it's part of our exposure. It's what makes me different from Ms. Mann, which makes me different from Dr. Mechanick. It's who we are in terms of how we act in the world. When you have a personality disorder, how you think, feel, and behave is at contrast with cultural norms. It causes you problems. It causes you distress. That's a personality disorder. And these are pretty much lifelong characteristics[.]

We start with evidence of an adult personality disorder in late adolescence, and we see it carry through. And particularly with [Appellant] here, we've seen the same type of behavior, the same type of thinking, the same type of feeling, and the same type of behavior carry through for 20 years starting with his behavior before that even where we saw the acting out and the aggression, the carrying of guns, the drug sales, the fighting, the possession of weapons when he was an adolescent. It's a longstanding pattern, and while there are questions that came up in terms of what's motivating it, it's clearly not a mental health disorder in the sense of schizophrenia. He's not psychotic at this time. He's been able to maintain good behavior [in prison] now for -- since July, and that's his decision to behave that way. He's not on any medication.

. . .

Antisocial personality disorder represents a pattern of behavior in an individual that the behavior that he engages in infringes on the rights of others, and infringing on the rights of others and this pattern begins in adolescence. And while we don't have any adolescent mental health records for [Appellant], clearly, his behavior -- drug sales, possession of guns, running away -- are typically seen in conduct disordered adolescence. And the progression from conduct disorder to antisocial personality disorder is a straight line. And what you see now is 20 years of adult behavior reflecting a constant and chronic pattern on infringing on the rights of others.

. . .

[Schizotypal personality disorder has] a constellation of symptoms. Most individuals with schizotypal are loners. They like to be alone. They don't like to engage. Engaging with other people causes them discomfort. They're very often described as peculiar or odd. They often have unusual perceptions. Again, a lot of the symptomology is similar to that which you can see on the schizophrenia form. Oftentimes you'll see that social anxiety, that difficulty in interacting with people. . . . [As to Appellant, h]e's uncomfortable. That's -- the flat affect is a common symptom to schizotypal. Many of the mental health records

- 13 -

reflect that. The unusual perceptions, the suspiciousness, the paranoia, those are documented well throughout the record.

. . .

The many notations in the psychiatric and mental health records of [Appellant] being [a] loner, of him being odd or peculiar, of him engaging in behaviors and then having a different type of emotional presentation, smirking while he's doing an obscene or aggressive act. These are very clear symptoms of [schizotypal] personality disorder. . . . The overall consistent pattern are the words that you saw throughout the records, loner, odd, peculiar, difficulty in getting along with people. That's the [schizotypal] personality disorder. And no there is no cure.

*Id.* at 343, 350-351, 353; N.T. Resentencing Hearing, 12/6/17, at 141-142.

Appellant's antisocial personality disorder manifests in Appellant's long-line of behaviors and actions that "infringe[] on the rights of others." Appellant's schizotypal personality disorder manifests in Appellant's social anxiety, wish to be alone, "odd or peculiar" behaviors and affectations, "unusual perceptions, [] suspiciousness, [and] paranoia;" and "engag[ement] in behaviors and then having a different type of emotional presentation, [such as] smirking while he's doing an obscene or aggressive act." *Id.* at 343, 350-351, 353; N.T. Resentencing Hearing, 12/6/17, at 141-142.

Dr. Russell stressed that Appellant's personality disorders will "never go[] away" because they are a part of his personality. N.T. Resentencing Hearing, 12/5/17, at 353. Notwithstanding, Dr. Russell acknowledged that "many of the folks who have [antisocial personality disorder], as they begin to hit their mid-50s, their early 60s, the violent behavior, the frequency of the

- 14 -

impulsive aggression you see just stop because of increasing age." *Id.* at 356. With respect to Appellant's schizotypal personality disorder, Dr. Russell opined: "[t]he peculiarities, the distortions, the suspiciousness of the schizotypal personality are probably only going to resolve themselves with a long-term medication and treatment if they could be resolved." *Id.* at 345. Dr. Russell advised that there is a strong need to protect the public from the Appellant as he has no desire to change his behavior and his history indicates a low likelihood that he will comply with any court-ordered treatment. N.T. 12/5/2017, pp. 345, 365.

Dr. Russell acknowledged that Appellant's expert, Dr. Stephen Mechanick, diagnosed Appellant as suffering from schizophrenia. *Id.* at 367. Dr. Russell disagreed with Dr. Mechanick's diagnosis because:

> In schizophrenia when the individual engages in those sort of crossover behaviors I described, the schizophrenic is never going to be able to understand that I engaged in those behaviors. They'll continue to deny or go on, whereas the person with the personality disorder can learn that [a particular] behavior[ is] inappropriate and that you need to change it. So there's a difference in the thinking process.

*Id.* at 367-368.

Regarding his risk assessment of Appellant, Dr. Russell testified:

> When you talk about risk assessment, the refusal to participate and engage, the refusal to maintain the medication or take the medication are very concerning behaviors because if he were to be successful outside of a prison system, they would have to be going on, compliance consistently. And when you have a 20-year pattern of noncompliance, inconsistency, it's extremely concerning from

a risk standpoint because there's no real reason why it would change.

. . .

His past behavior is a solid predictor of placing him at a high risk of continued engag[ement] in aggressive behavior. . . . [Specifically, h]is past behavior, . . . his pattern of behavior wasn't one that came in flux. It didn't -- here and [there] we didn't see it for two years . . . -- but for 20 years we've seen multiple examples every year of this behavior. . . . At this point the [Appellant] that I interviewed and reviewed the history of 20 years and his adolescence, there's no reason to think that the behavior would change at this point.

. . .

[Y]ou can't talk in absolutes, Your Honor. I can't say he'll never do something or he will do something. But when you look at the likelihood of his ongoing aggressive behavior, his ongoing problems in interacting with people, the risk of continued aggressive behavior is high.

*Id.* at 354-355 and 356.

Appellant was not rehabilitated at the time of the resentencing hearing and, "[g]iven his history," he is not likely to be rehabilitated "without his volition." *Id.* at 356.

On cross-examination, Dr. Russell explained that, in making a risk assessment of a person, "you cannot say that someone can never be rehabilitated or that someone will certainly commit a crime. . . . [T]here is no way you can say that they cannot be rehabilitated or that they will be rehabilitated. It's just simply not possible in risk assessment." N.T. Resentencing Hearing, 12/6/17, at 63-64. Further, Dr. Russell explained "aging" is "the only intervention" for antisocial personality disorder and

explained that, since Appellant is only in his 40s, there is "[n]o possible way to know right now" whether Appellant is in the category of people whose violence and aggressive impulses subside as they age. *Id.* at 36. Dr. Russell reiterated that although it may not be cured, Appellant's schizotypal personality disorder may be managed with medication and intensive therapeutic interventions. *Id.* at 141-143

Appellant presented the testimony of mitigation specialist Merrilee Weiss Bodzin. *Id.* at 15. Ms. Weiss Bodzin testified that, to prepare for the resentencing hearing, she "gathered all of the records that were available about [Appellant's] background, his records from his childhood that could be obtained or tried to, spoke to, contacted, found family members[,] interviewed them and obtained all the information that [she] could and spoke with [Appellant] and his family members many times." *Id.*

Appellant, his siblings, and his mother and father emigrated from Puerto Rico to live in Chester County, Pennsylvania, when Appellant was eight years old. *Id.* at 23. Appellant grew up in Chester County very poor, with an abusive father who spent a lot of the family's money on alcohol and with a mother who was not nurturing. *Id.* at 51. Appellant was "very disadvantaged culturally" in Chester County; "he did not understand the language and found [school] very difficult[; he] was teased by others and had a difficult time and got in fights[; he] was placed in . . . vocational classes and he dropped out of school at the age of 15[;]" and he left home at the age of 14. *Id.* at 38, 40-41, and 51. Although Appellant was "raised in a very Catholic household[,]"

. . . since he has been incarcerated he has found Judaism and is [a] very, very religious Orthodox Jew and practices daily and studies daily." *Id.* at 49.

Appellant next presented the testimony of Dr. Stephen Michael Mechanick, as an expert in the field of psychiatry. *Id.* at 191. Dr. Mechanick testified that, after reviewing Appellant's records and conducting an in-person evaluation of Appellant, he diagnosed Appellant as suffering from schizophrenia. *Id.* at 201. He testified:

> I made that diagnosis based on the fact, in my opinion, that he has had a history of delusions as well as hallucinations[,] which are two of the criteria for the diagnosis of schizophrenia, and these have been present over periods of time.
>
> In addition, he has shown problems with his functioning socially it is hard to -- I guess one could say to some degree occupationally within the correctional setting. His manner and behavior have been odd. His speech is sometimes odd and has been described that way. His thought processes are odd. And it is not due to some other disorder, that is, clearly in this setting it is not due to the effects of a drug or alcohol.

*Id.* at 201-202.

Dr. Mechanick testified that schizophrenia is treatable through medication, "a collaborative relationship [between the doctor and] the patient to help the patient get on medicine and stay on medicine," therapy, and support groups. *Id.* at 212-213. However, Dr. Mechanick testified that most of Appellant's prior psychotherapists diagnosed Appellant as suffering from antisocial personality disorder and schizotypal personality disorder, rather than schizophrenia. Thus, Dr. Mechanick testified, Appellant has not yet been

prescribed the proper treatment for his true mental illness. *Id.* at 200-202 and 212.

Dr. Mechanick recognized that Dr. Russell diagnosed Appellant as suffering from schizotypal personality disorder, rather than schizophrenia. However, Dr. Mechanick testified that, even if Appellant suffers from schizotypal personality disorder:

> Schizotypal personality disorder is a potentially treatable condition. It is treatable with medications. There is literature that shows there is a significant response rate. Maybe 40 to 50% of people will respond to medications. It is also treatable through psychotherapeutic and psychosocial techniques similar to what I have described with schizophrenia. So support, education, cognitive behavioral treatment, engagement in helping to identify and use healthy coping skills all of these things are helpful for both [schizotypal personality disorder and schizophrenia]. I would add . . . [that] psychosocial interventions can also be helpful with antisocial personality disorder. Not everybody responds. Some people respond better than others. Some of the more prominent psychotic symptoms can abate with time, just with the passage of time as well.

*Id.* at 216-217.

Further, although Dr. Mechanick did not diagnose Appellant as suffering from antisocial personality disorder, Dr. Mechanick opined that, if Appellant is suffering from antisocial personality disorder, Appellant's "patterns of behavior . . . [can] be lessened or ameliorated or improved with time and treatment" and, also, "the tendency to engage in criminal activity or violent behavior or antisocial behavior does tend to reduce over time." *Id.* at 219-220.

Dr. Mechanick agreed with Dr. Russell that, as of the time of the resentencing hearing, Appellant posed a "significant risk of engaging in dangerous and problematic behavior" and had not "shown sufficient improvement that he would be safe to be released [into] the community." *Id.* at 222-223.

On January 5, 2018, the trial court resentenced Appellant to serve the originally imposed sentence: a term of life in prison without the possibility of parole for the second-degree murder of Raymond McKinley and a consecutive term of twelve (12) months to sixty (60) months in prison for the aggravated assault upon Thomas McKinley.[4] N.T. Resentencing Hearing, 1/5/18, at 6. In support of its resentence, the trial court issued detailed findings of fact and conclusions of law.[5] Its conclusions of law read, in relevant part, as follows:

> 1. The [trial] court finds the testimony of the witnesses employed by the Department of Corrections to be credible.
>
> 2. The [trial] court finds the testimony of Dr. William Russell to be credible.
>
> 3. The [trial] court finds the testimony of Merrilee Weiss Bodzin to be credible as to what she did, but finds the information contained in her report offered by [Appellant's] family members to be unsubstantiated as none of what was contained in the report was elicited from their testimony on direct examination.

---

[4] The court also sentenced Appellant to serve a concurrent term of six (6) months to twelve (12) months in prison for possessing a firearm without a license. N.T. Resentencing Hearing, 1/5/18, at 6.

[5] The trial court enumerated one hundred five (105) Findings of Fact and thirty-nine (39) conclusions of law.

. . .

9. The [trial] court finds the testimony of Dr. Stephen Mechanick to be credible.

10. Preeminently, [Appellant's] brutal attack on [his fellow-inmate], as seen on the video, unequivocally demonstrates the continued aggressive behavior and antisocial personality disorder of [Appellant] and solidifies th[e trial] court's decision that [Appellant] is not [amenable] to rehabilitation and poses a clear threat and ongoing danger to society should he be released.

11. In **Miller v. Alabama**, [ ] the United States Supreme Court [held] that mandatory life-without-parole for juveniles violates the Eighth Amendment and precludes consideration of the offender's chronological age and its hallmark features – among them, immaturity, impetuosity, and failure to appreciate risks and consequences. Deciding that a juvenile offender will forever be a danger to society would require making a judgment that he is incorrigible and finding that his crime reflects irreparable corruption. Although the Supreme Court did not foreclose a sentencer's ability to make that judgment in homicide cases, the sentencer must take into account how children are different, and how those differences guide against irrevocably sentencing them to a lifetime in prison.

12. [In **Montgomery v. Louisiana**, the United States Supreme Court] rendered life without parole an unconstitutional penalty for "a class of defendants because of their status" – that is, juvenile offenders whose crimes reflect the transient immaturity of youth.

13. [In **Commonwealth v. Batts**, 163 A.3d 410 (Pa. 2017), the Pennsylvania Supreme Court held that] there is a presumption against the imposition of a sentence of life without parole for a juvenile offender. To rebut the presumption, the Commonwealth bears the burden of proving, beyond a reasonable doubt, that the juvenile offender is incapable of rehabilitation.

14. After **Miller**, the Pennsylvania General Assembly enacted a new sentencing statute for juveniles convicted of first and

- 21 -

second degree murder after June 24, 2012. 18 Pa.C.S. § 1102.1. Because this homicide occurred in [1994], the statute is not applicable, but should be used for guidance[.]

15. [Enumeration of **Batts II** factors for imposing a LWOP sentence, **see infra**].

16. The killing of Raymond McKinley has had a profound impact on the family. [Appellant] deprived his wife of the love and consortium of her husband, which lives on to this day. [Appellant] prematurely took the father of three children. So painful is the loss that the daughters could not bear to come to testify or watch the hearing.

17. The impact on the victim was tragically horrendous. Rendered a quadriplegic, Raymond [McKinley] immediately became dependent on a breathing machine; he had to suffer the indignity of having others wash him, feed him and change him. While his body did not move, his mind absorbed all that was going on; he was a prisoner within his own body. He could not even swat away the flies that landed on his eyes. He suffered pain, mental anguish and despair for over three years. Some may say that death was mercy, but losing a husband, father, and brother to a senseless act of violence never eradicates the pain or erases the memory of what Raymond experienced or the helplessness the family felt. Forever they will be haunted by the searing picture of a shell of a man lying hopelessly in a nursing home with the attendant odors always in their nostrils.

18. The family asked th[e trial] court to re-impose the original sentence of life without parole, as the just punishment due [Appellant].

19. The impact on the community is enormous. [Appellant] was a drug dealer. To this very day, the City of Chester is plagued by a continuing line of dealers, which only adds to the violence, the same violence which played out at Green and McIlvain Streets on May 20, 1994. The argument that [Appellant] was just a runner for the more experienced pushers is of no moment. [Appellant] was vying to protect his turf and make a sale. He was street wise. Nothing in the trial transcripts or the transcripts from the sentencing hearing point to a naive 17-year-old.

20. The fact that [Appellant] possessed a gun and intentionally opened fire on two individuals, regardless of why they were there, demonstrates a total disregard for the safety of those who were in and around the Spanish American Club. As the car attempted to flee from the area, [Appellant] fired more shots, in the direction of the car without concern for others.

21. [Appellant] was the lone shooter. When he couldn't make the sale he attempted to rob the driver. He alone is responsible for the death of Raymond McKinley.

22. The Pennsylvania Sentencing Guidelines recommend life in prison.

23. [Appellant] was 17 years of age at the time and would turn 18 in less than 4 months. The [trial] court finds this to be significant in its consideration.

24. Dr. James P. Rokos, who was appointed by the court, administered several tests to [Appellant] on January 12, 1998. The Wechsler Adult Intelligence Scale showed a verbal scale IQ of 78, a Performance Scale IQ of 87 and a Full Scale IQ of 80. The Wide Range Achievement Test - Third Revision (WRAT-3) showed a Reading Level of 6th grade, a Spelling Level of 6th grade, and an Arithmetic Level of 7th grade. The Minnesota Multiphasic Personality Inventory was attempted, but not completed.

25. The above psychological testing places [Appellant] within the lower limits of the dull normal range of intelligence. The WRAT-3 found significant underachievement in all areas measured with respect to formal education and estimated potential.

26. As to maturity, on the personality assessment, [Appellant] presented as an egocentric, impulsive and dependent adult male with low self-esteem and having a strong need for attention, affection and acceptance and is easily influenced by others.

27. The [trial] court places great emphasis on Dr. Rokos' evaluation and report. First, because it was court ordered

and not done at the behest of counsel. Second, it is the only definitive psychological record that was performed in and around the time of the conviction, which [was] [three-and-one-half] years after the event.

28. Another aspect th[e trial] court has considered was the inability of the Chester-Upland School District to produce any records related to [Appellant]. Had the school district been able to provide documentation, th[e trial] court would have had an unbiased look into [Appellant's] early development. Absent these, there is no concrete evidence from which the [trial] court can discern [Appellant's] learning ability, his assimilation into the community and his disciplinary history.

29. [Appellant] self-reported two instances of juvenile court involvement, although no definitive record was located. This leads the [trial] court to believe that [Appellant] at least had a glimpse into the legal system.

30. The fact, according to him, that he had three placements, but was unsuccessfully expelled from all three for aggressive behavior, gives the [trial] court great pause in its evaluation as to the possibility of rehabilitation.

31. One of the most concerning issues is not only the number of misconduct reports, but the time period over which these transpired. If one were truly amenable to rehabilitation, the record should reflect a diminution rather than an escalation of events. Nowhere is this more clearly demonstrated than in the assaults inflicted on correctional staff and the gruesome and premeditated attack on another inmate as clearly seen on the video. Furthermore, there was a felony criminal conviction stemming from one of the assaults on correctional staff. All of these are documented in the numerous misconduct reports entered as exhibits.

32. None of the alleged excuses presented by [Appellant] as justification for the misconducts are satisfactory. These only add credence to the Commonwealth's claim that [Appellant] is an aggressive, anger-filled, vengeful person who has total and unmitigated disdain for authority and is incapable of complying with rules and regulations and conforming his behavior to acceptable behavioral standards of the community.

- 24 -

33. The [trial] court is also confronted with [Appellant's] lack of participation in programs meant to address his issues and help him better himself, as well as his lack of compliance with medication regimens. Obviously, some of this has been precipitated by [Appellant's] behavioral problems which have resulted in [placements within] the Restrictive Housing Unit [(RHU)], as well as [relocation] to different institutions. Notwithstanding, there is documentation that even when offered, with the exception of the one victim awareness program, [Appellant] has not taken advantage of any other programs, including those offered on RHU, no matter how limited they may be.

34. Although [Appellant's] counsel argues that given [Appellant's] situation of life without parole, there was no motivation for him to participate in these programs, one would expect that he would be willing to do so just for his own well-being. Most compelling is the fact that even after *Miller* was decided and the entire juvenile lifer population was made aware of it, [Appellant] did virtually nothing aimed at rehabilitation. The *Miller* decision alone should have provided sufficient motivation for [Appellant] to participate in therapy. Therefore, the [trial] court is left to conclude that [Appellant] has [consciously] chosen not to seek help or participate in programs aimed at his rehabilitation.

35. The fact that [Appellant] did not incur any misconducts from November 29, 2006 to May 4, 2011 lends significant credence to Dr. Russell's analysis that [Appellant's] aggressive, antisocial behavior is volitional and not due to schizophrenia. Likewise, [Appellant] has not incurred any misconduct reports in the months he has been housed at George W. Hill Correctional Facility awaiting the re-sentencing hearing.

36. Dr. Russell's opines that [Appellant] has a diagnosis of antisocial personality disorder and schizotypal personality disorder, while Dr. Mechanick opines that he suffers from paranoid schizophrenia. Regardless, both do agree that absent some improvement [Appellant] is currently at significant risk for engaging in dangerous and problematic behavior. Dr. Mechanick, in an attempt to bolster [Appellant's] claim that he suffered side effects from the

medications prescribed for him to treat his mental health issues as his basis for refusing to follow the various treatment regimens, speculates that a new class of second generation drugs or possible future advancements in pharmaceuticals designed to treat schizophrenia will prove to be the necessary elixir to free [Appellant] from his reports of delusions and hallucinations. Th[e trial] court lacks the ability to see into the future and can only be guided by what [] has preceded and what is the current standard of care. Given these parameters, the [trial] court is unable to conclude that [Appellant] will be able to improve in the foreseeable future and remains a significant risk to the community and to correctional staff at this time.

37. The Commonwealth bears the burden of proving beyond a reasonable doubt that [Appellant] is one of those rare individuals who will never be amenable to rehabilitation. This standard is not without its complications as it is nearly impossible for any trial judge, just like any psychiatrist, to predict with mathematical certainty what the future holds. However, th[e trial] court's decision must and is grounded solely on the testimony and exhibits presented at the re-sentencing hearing, as well as the transcripts from the original trial and sentencing[.]

38. The [trial] court is also mindful that beyond a reasonable doubt does not mean no doubt nor does it require mathematical certainty[.]

39. Therefore, after most careful and very deliberate analysis, th[e trial] court finds that the Commonwealth has met its burden of proof beyond a reasonable doubt that [Appellant] is one of those rare individuals who will never be amenable to rehabilitation.

Findings of Fact and Conclusions of Law, 1/5/18, at 17-23 (some capitalization and case citations omitted).

On February 16, 2018, the trial court denied Appellant's post-sentence motion, and Appellant filed a timely notice of appeal. Appellant filed a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b).

J-A07009-19

In its Pa.R.A.P. 1925(a) Opinion filed on April 30, 2018, the trial court relied upon its reasoning set forth in its January 5, 2018, Findings of Fact and Conclusions of Law and upon its February 15, 2018, Order wherein it had denied Appellant's post sentence motion upon finding no merit to the claims Appellant raised on appeal. In his appellate brief, Appellant presents five (5) questions for this Court's review:

I.     Whether the lower court erred by imposing an illegal sentence of life confinement without the possibility of parole for second-degree murder committed as a juvenile, in violation of [Appellant's] rights under the Eighth and Fourteenth Amendments of the United States Constitution, as well as Article 1, Section 13 of the Pennsylvania Constitution?

II.    Whether the sentence is illegal, because the lower court lacked competent evidence to sentence [Appellant] to life confinement without the possibility of parole, where a proper consideration of the attendant characteristics of youth demonstrates the government failed to overcome the presumption in favor of parole eligibility?

III.   Whether [Appellant's] sentence of life confinement without the possibility of parole is illegal, because the government did not present sufficient evidence to prove beyond a reasonable doubt that [Appellant's] rehabilitation is impossible and, in the alternative, whether the lower court's finding that rehabilitation is impossible was against the weight of the evidence?

IV.    Whether the court erred by failing to properly apply the presumption of a sentence of life with the possibility of parole at each stage of its analysis and by impermissibly shifting the burden of proof onto the defense to prove [Appellant] was capable of rehabilitation?

V.     Whether [Appellant's] sentence of life confinement without the possibility of parole is illegal, because the

- 27 -

> Commonwealth failed to provide adequate notice of its intention to seek life confinement without the possibility of parole and did not detail the reasons for seeking such a sentence in its notice?

Appellant's Brief at 5-6 (italics omitted).

Appellant's multifaceted argument essentially challenges whether the trial court properly resentenced him to serve a LWOP for a murder Appellant committed while he was a juvenile. Whether the trial court has the authority to impose a given sentence presents a challenge to the legality of that sentence. **Commonwealth v. Robinson**, 7 A.3d 868, 870 (Pa.Super. 2010); **see also Commonwealth v. Catt**, 994 A.2d 1158, 1160 (Pa.Super. 2010) (*en banc*) ("[a] claim that implicates the fundamental legal authority of the court to impose a particular sentence constitutes a challenge to the legality of the sentence"). The legality of one's sentence is a question of law and our standard of review is plenary. **Commonwealth v. Garzone**, 993 A.2d 306, 316 (Pa.Super. 2010) (citation and quotation marks omitted).

As previously stated, in **Miller v. Alabama** the United States Supreme Court held that the Eighth Amendment prohibits sentencing schemes that mandate LWOP for juvenile homicide offenders. **Miller**, 567 U.S. at 479. The High Court reasoned that such mandatory sentencing schemes impermissibly fail to take into account the age and age-related characteristics of a juvenile when sentencing him or her. **Miller**, 567 U.S. at 477-78, 489. This Court more recently highlighted that the **Miller** Court further held "states must provide a juvenile convicted of a homicide offense a meaningful opportunity

to obtain release based on demonstrated maturity and rehabilitation unless the sentencing authority finds that the juvenile is incapable of rehabilitation." *Commonwealth v. Foust*, 180 A.3d 416, 431 (Pa.Super. 2018) (petition for allowance of appeal filed, March 23, 2018). Therefore, the *Miller* Court did not deem all life sentences without parole for juveniles to be unconstitutional.

In *Batts II*, *supra*,[6] our Supreme Court recognized "a presumption against the imposition of a sentence of life without parole for a juvenile offender" and held that "to rebut the presumption, the Commonwealth bears the burden of proving, beyond a reasonable doubt, that the juvenile offender is incapable of rehabilitation." Following this decision, to obtain a LWOP sentence when resentencing a juvenile offender in Pennsylvania, the

---

[6] In *Commonwealth v. Batts*, 620 Pa. 115, 66 A.3d 286, 297 (2013) ("*Batts I*"); the Pennsylvania Supreme Court quoted approvingly from this Court's opinion in *Commonwealth v. Knox*, 50 A.3d 732, 745 (Pa.Super. 2012), wherein we held:

> although *Miller* did not delineate specifically what factors a sentencing court must consider, at a minimum it should consider a juvenile's age at the time of the offense, his diminished culpability and capacity for change, the circumstances of the crime, the extent of his participation in the crime, his family, home and neighborhood environment, his emotional maturity and development, the extent that familial and/or peer pressure may have affected him, his past exposure to violence, his drug and alcohol history, his ability to deal with the police, his capacity to assist his attorney, his mental health history, and his potential for rehabilitation.

*see also Batts II*, 163 A.3d at 455 n.23.

Commonwealth must: (1) provide reasonable notice to the defendant before the sentencing hearing of its intent to seek a life sentence; and (2) overcome the presumption against the imposition of an LWOP sentence by proving beyond a reasonable doubt that the juvenile "forever will be a danger to society" and "exhibits such irretrievable depravity that rehabilitation is impossible." *Id.*, 163 A.3d at 455.

Further, *Batts II* "devise[d] a procedure for the implementation of the *Miller* and *Montgomery* decisions in Pennsylvania." *Id.* at 451. *Batts II* directed that in order for an LWOP sentence to be valid, "the sentencing court's decision must take into account the factors announced in *Miller* and section 1102.1(d) of the Crimes Code." *Id.* at 459. *Batts II* identified the *Miller* factors as, at a minimum:

> [the] juvenile's age at the time of the offense, his diminished culpability and capacity for change, the circumstances of the crime, the extent of his participation in the crime, his family, home and neighborhood environment, his emotional maturity and development, the extent that familial and/or peer pressure may have affected him, his past exposure to violence, his drug and alcohol history, his ability to deal with the police, his capacity to assist his attorney, his mental health history, and his potential for rehabilitation.

*Id.* at 421 n. 5 (citations omitted). Thus, the *Batts II* Court held, "in the absence of the sentencing court reaching a conclusion, supported by competent evidence, that the defendant will forever be incorrigible, without any hope for rehabilitation, a life-without-parole sentence imposed on a juvenile is illegal, as it is beyond the court's power to impose." *Id.*

- 30 -

Initially, we consider Appellant's fifth claim that his due process rights have been violated because he was not afforded proper notice of the Commonwealth's intention to seek a LWOP upon resentencing. The record clearly indicates the Commonwealth filed a notice of its intent to seek the imposition of a life sentence wherein it specified it would pursue a life sentence for Appellant. During an August 12, 2016, status conference, the trial court indicated it assumed "based on the documents that the Commonwealth is going to put up a vigorous representation as to why that term should –that life imprisonment and term should stay." T

The Commonwealth promised it would "certainly be presenting a full sentencing hearing." N.T., 8/12/16, at 7-8. In addition, on July 25, 2017, the trial court held a status hearing at which time it asked defense counsel, in Appellant's presence, whether he had received the Commonwealth's notice that it was opposing any reduction of his LWOP sentence; defense counsel responded in the affirmative. *See* N.T., 7/25/2017, at 15. Therefore, Appellant's present claim to the contrary is disingenuous and meritless.

With regard to Appellant's remaining, related claims, we find the trial court's Findings of Fact and Conclusions of Law demonstrate it meticulously considered the *Miller* factors prior to resentencing. Significantly, the trial court heard testimony and reviewed reports prepared by prison officials and mental health professionals who agreed that to be rehabilitated, Appellant needed to participate in programs offered by the prison over the years.

However, it is undisputed that Appellant has failed to avail himself of the opportunities and medication afforded to him. As a result, Appellant's vulgar, violent and antisocial behavior has persisted.

At the resentencing hearing, the Commonwealth presented evidence which showed that since the time Appellant was imprisoned for second-degree murder in 1997, he has engaged in a "consistent pattern of aggressive, defian[t] behavior." N.T. Resentencing Hearing, 12/5/17, at 215 and 263.[7] This behavior witnessed by individuals who have had regular contact with Appellant for years includes multiple violations of prison regulations and a variety of criminal acts, such as Appellant's: unprovoked stabbing of a fellow inmate in the face in February 2012; "squirt[ing] a [shampoo] bottle [filled with] urine [and feces]" at inmates or prison employees, which occurred in 2012, 2014, and 2016; and multiple acts of sexual harassment.

There is nothing in the record to indicate that Appellant's psychological disorders will resolve themselves without proper medication and intervention, yet the Commonwealth has shown Appellant ignores therapeutic opportunities and refuses to take medication with regularity. Indeed, Appellant, who is now

_____

[7] In **Miller**, the Supreme Court held that a trial court must determine whether, at the time of the crime, the defendant was "permanently incorrigible." **See Miller**, 567 U.S. at 479-480. Nevertheless, in **Montgomery**, the Supreme Court held that a defendant's post-conviction prison conduct was relevant to the issue of whether he is "capable of change." **See Montgomery**, 136 S.Ct. at 736; **see also Batts II**, 163 A.3d at 456 ("**Montgomery** . . . plainly requires a court to consider the post-crime conduct of a defendant in determining whether life without parole is a permissible sentence").

in his mid-forties, refuses to follow any recommended course of treatment. Drs. Mechanick and Russell stressed that without rehabilitation, Appellant will continue to be a danger to others. N.T. Resentencing Hearing, 12/5/17, at 216-17; 317-18, 345. In fact, Dr. Russell testified, that given Appellant's past behavior, his "refusal to participate and engage" in therapy, and his "refusal to maintain the medication or take the medication," "the risk of [Appellant's] continued aggressive behavior is high." *Id.* at 354-356.

As the trial court stressed, the victim of Appellant's shooting, Raymond McKinley, had his spinal cord essentially destroyed at the level of the fourth or fifth vertebrae. As a result, Mr. McKinley was rendered a quadriplegic, unable to move or sense his arms and legs, move his bladder or bowels, swallow, or even breathe without a respirator. Mr. McKinley never was able to come off a respirator, nor was he ever able to go home after the shooting. He ultimately died in a nursing home approximately two-and-a-half years after he had been shot. Trial Court Opinion, 8/26/98, at 5.

As previously discussed, while in prison Appellant has continued to violate prison rules and to engage in abhorrent and violent behavior that has been documented over fifty (50) times. The most serious instance occurred on February 12, 2012, when Appellant, unprovoked, stabbed and a fellow-inmate in the face with a filed-down toothbrush, seriously injuring him. N.T. Resentencing Hearing, 12/5/17, at 244-247, 269. Such perverse and calculated actions evince they are not controlled by a psychological state but,

rather, that Appellant is able to prepare and carry out a dangerous plan. Dr. Russell believed additional evidence of Appellant's manipulative behavior was revealed in the SCI records which showed Appellant had requested books on schizophrenia and psychology from the library. N.T. 12/5/2017, at 316-317.

The fact that Appellant's abhorrent behavior has reoccurred throughout the years reveals he has made no real progress toward demonstrating maturity and rehabilitation. Appellant's failure, over a period of decades, to take responsibility for his own brutal actions taken when he was only four months shy of eighteen and to avail himself of the treatment and medication afforded to him while in prison supports the trial court's conclusion that he is incorrigible.

There is no record evidence that Appellant's "consistent pattern of aggressive, defiant behavior" will ever change. Indeed, Appellant's aggressive and antisocial behavior has not ceased despite his entering middle age, a time of life the expert testimony has concluded that the frequency of impulsive aggression for many people who have antisocial personality disorder would "just stop," according to Dr. Russell. N.T. Resentencing Hearing, 12/5/17 at 356.

The learned trial court properly weighed the *Miller* factors and reached the correct conclusion that the Commonwealth's evidence herein was sufficient to rebut the presumption against the imposition a life sentence without the possibility of parole. The weighing process of the *Miller* factors

is exclusively for the sentencing court, and we, as an appellate court, may not reweigh sentencing factors and substitute our own judgment of the proper sentence. ***Commonwealth v. Bricker***, 41 A.3d 872, 876 (Pa. Super. 2012). Thus, the trial court's Findings of Fact and Conclusions of Law herein are supported by the record and free of legal error.

Therefore, we find no merit to Appellant's remaining claims and affirm the judgment of sentence.

Judgment of sentence affirmed.

Judge Dubow joins the Opinion.

Judge Olson files a Dissenting Opinion.


Judgment Entered.


Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/6/20