J-A07009-19

2020 PA Super 158

COMMONWEALTH OF PENNSYLVANIA    :    IN THE SUPERIOR COURT OF
                                                    :            PENNSYLVANIA
                      : 
            v.                      : 
                      : 
                      : 
JOSE JAVIER DEJESUS                : 
                      : 
           Appellant          :    No. 883 EDA 2018

Appeal from the Judgment of Sentence January 5, 2018
In the Court of Common Pleas of Delaware County Criminal Division at
No(s):  CP-23-CR-0001277-1997

BEFORE:   OLSON, J., DUBOW, J., and STEVENS*, P.J.E.

DISSENTING OPINION BY OLSON, J.:              **FILED JULY 06, 2020**

I must respectfully dissent from my learned colleagues.  I believe that the evidence is insufficient to rebut the presumption against imposing a life-without-parole sentence and that Appellant's sentence is illegal.  Thus, I would vacate Appellant's judgment of sentence and remand for resentencing.

In **Miller v. Alabama**, the United States Supreme Court held "that mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'"  **Miller**, 567 U.S. at 465.  In arriving at this conclusion, the Supreme Court relied upon its past precedents in **Graham v. Florida** and **Roper v. Simmons**.  **See Graham v. Florida**, 560 U.S. 48 (2010); **see also Roper v. Simmons**, 543 U.S. 551 (2005).  The **Miller** Court explained that **Graham** and **Roper** "establish[ed] that children are constitutionally different from adults for purposes of sentencing" because:

_____
\*   Former Justice specially assigned to the Superior Court.

[1)] children have a lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking[; 2)] children are more vulnerable to negative influences and outside pressures, including from their family and peers; they have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings[; and, 3)] a child's character is not as well formed as an adult's; his traits are less fixed and his actions less likely to be evidence of irretrievable depravity.

*Id.* at 471 (quotations, citations, and corrections omitted), *quoting* **Graham**, 560 U.S. at 68 and **Roper**, 543 U.S. at 569 and 570.

The **Miller** Court held that, "[b]ecause juveniles have diminished culpability and greater prospects for reform [than adults] . . . they are less deserving of the most severe punishments" and, as a class, "the distinctive attributes of youth diminish the penological justifications" for imposing upon juveniles life without parole. **Miller**, 567 U.S. at 471 and 472 (quotations omitted). Further, the **Miller** Court echoed **Graham** by "likening life-without-parole sentences imposed on juveniles to the death penalty itself." *Id.* at 474. The **Miller** Court explained:

Life-without-parole terms . . . share some characteristics with death sentences that are shared by no other sentences. Imprisoning an offender until he dies alters the remainder of his life by a forfeiture that is irrevocable. And this lengthiest possible incarceration is an especially harsh punishment for a juvenile, because he will almost inevitably serve more years and a greater percentage of his life in prison than an adult offender. The penalty when imposed on a teenager, as compared with an older person, is therefore the same in name only.

*Id.* at 474-475 (quotations, citations, and corrections omitted).

In **Miller**, however, the State sought to impose the "ultimate penalty for juveniles" – a term of life in prison without the possibility of parole – as a mandatory penalty for a juvenile convicted of murder. **Id.** at 475. The mandatory nature of this penalty precluded the sentencer from considering mitigating factors, such as "the distinctive attributes of youth," before imposing the State's most severe punishment upon the juvenile. As the **Miller** Court held, this was unconstitutional:

> By removing youth from the balance – by subjecting a juvenile to the same life-without-parole sentence applicable to an adult – these laws prohibit a sentencing authority from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender. That contravenes **Graham's** (and also **Roper's**) foundational principle: that imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children.
>
> . . .
>
> Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features – among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him – and from which he cannot usually extricate himself – no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth – for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it.

- 3 -

*Id.* at 474 and 477-478.

Although the *Miller* Court did not absolutely preclude a sentence of life in prison without the possibility of parole upon a juvenile, the High Court explained:

> given all we have said in *Roper*, *Graham*, and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption. Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.

*Id.* at 479-480 (quotations and citations omitted).

The Supreme Court expounded upon *Miller* in *Montgomery v. Louisiana*. In *Montgomery*, the Supreme Court held that *Miller* announced a new, substantive rule of constitutional law that states must apply retroactively to juvenile offenders on collateral review. *Montgomery*, 136 S.Ct. at 726 and 732. In concluding that *Miller* announced a substantive rule – and, thus, a rule that "prohibits a certain category of punishment for a class of defendants because of their status" – the *Montgomery* Court held:

> *Miller* requires that before sentencing a juvenile to life without parole, the sentencing judge take into account "how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." [*Miller*, 567 U.S. at 480]. The Court recognized that a

sentencer might encounter the rare juvenile offender who exhibits such irretrievable depravity that rehabilitation is impossible and life without parole is justified. But in light of children's diminished culpability and heightened capacity for change, *Miller* made clear that appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon.

*Miller*, then, did more than require a sentencer to consider a juvenile offender's youth before imposing life without parole; it established that the penological justifications for life without parole collapse in light of the distinctive attributes of youth. Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects "unfortunate yet transient immaturity." [*Miller*, 567 U.S. at 479]. Because *Miller* determined that sentencing a child to life without parole is excessive for all but "the rare juvenile offender whose crime reflects irreparable corruption," it rendered life without parole an unconstitutional penalty for "a class of defendants because of their status" – that is, juvenile offenders whose crimes reflect the transient immaturity of youth. As a result, *Miller* announced a substantive rule of constitutional law. Like other substantive rules, *Miller* is retroactive because it necessarily carries a significant risk that a defendant – here, the vast majority of juvenile offenders – faces a punishment that the law cannot impose upon him.

*Montgomery*, 136 S.Ct. at 734 (corrections and some quotations and citations omitted).

The Pennsylvania Supreme Court interpreted and applied *Miller* and *Montgomery* in *Commonwealth v. Batts*, 163 A.3d 410 (Pa. 2017) (hereinafter "*Batts II*"). The facts of *Batts II* – and the Pennsylvania Supreme Court's prior opinion in *Commonwealth v. Batts*, 66 A.3d 286 (Pa. 2013) ("hereinafter *Batts I*") – are as follows.

- 5 -

On February 7, 2006, Qu'eed Batts walked up to Clarence Edwards and shot him twice in the head, killing him; Batts also shot Corey Hilario once in the back, causing him serious bodily injury. ***Batts II***, 163 A.3d at 414. At the time of the murder, Batts was 14 years old. ***Id.*** at 411.

The jury convicted Batts of first-degree murder, attempted murder, and aggravated assault and, on October 22, 2007, the trial court sentenced Batts to serve the then-mandatory term of life in prison without the possibility of parole for his first-degree murder conviction. After we affirmed Batts' judgment of sentence, the Pennsylvania Supreme Court granted Batts' petition for allowance of appeal. The Supreme Court then held the case pending the United States Supreme Court's decision in ***Miller***. ***Id.*** at 419.

The Pennsylvania Supreme Court issued its opinion in ***Batts I*** on March 26, 2013. Essentially, in ***Batts I***, the Supreme Court held that Batts' **mandatory** sentence of life in prison without the possibility of parole was unconstitutional. Notwithstanding, "juveniles convicted of first-degree murder prior to ***Miller*** could, after the sentencing court's evaluation of the criteria identified in ***Miller***, be subjected to a sentence of life in prison without the possibility of parole." ***See Batts II***, 163 A.3d at 421 (footnote omitted). The ***Batts I*** Court thus remanded the case to the trial court for resentencing. ***Id.***

After the resentencing hearing, the trial court again sentenced Batts to life-without-parole for his first-degree murder conviction. After this Court again affirmed Batts' judgment of sentence, the Supreme Court granted Batts' petition for allowance of appeal.

- 6 -

At the outset, the **Batts II** Court held that a challenge to the sufficiency of the evidence supporting a life-without-parole sentence is a challenge to the legality of the sentence. **Id.** at 435-436. This is because, under **Miller** and **Montgomery**, "a sentencing court has no discretion to sentence a juvenile offender to life without parole unless it finds that the defendant is one of the 'rare' and 'uncommon' children" who:

> is entirely unable to change[,] . . . that there is no possibility that the offender could be rehabilitated at any point later in his life, no matter how much time he spends in prison and regardless of the amount of therapeutic interventions he receives, and that the crime committed reflects the juvenile's true and unchangeable personality and character.

**Id.** at 435.

Thus, the **Batts II** Court held, "in the absence of the sentencing court reaching a conclusion, supported by competent evidence, that the defendant will forever be incorrigible, without any hope for rehabilitation, a life-without-parole sentence imposed on a juvenile is illegal, as it is beyond the court's power to impose." **Id.**; **see also Commonwealth v. Catt**, 994 A.2d 1158, 1160 (Pa. Super. 2010) (**en banc**) ("[a] claim that implicates the fundamental legal authority of the court to impose a particular sentence constitutes a challenge to the legality of the sentence").

Further, since a challenge to the evidentiary sufficiency of a life-without-parole sentence implicates the legality of the defendant's sentence, the Supreme Court held that the appellate court's standard and scope of review for such a claim is as follows:

we must review the sentencing court's legal conclusion that [a defendant] is eligible to receive a sentence of life without parole pursuant to a *de novo* standard and plenary scope of review. Because this legal conclusion is premised upon the presentation of testimony and the sentencing court's credibility determinations, it presents a mixed question of fact and law. In such circumstances, we defer to the findings of fact made by the sentencing court as long as they are supported by competent evidence, but give no deference to that court's legal conclusions.

*Batts II*, 163 A.3d at 435-436 (citations omitted).

The *Batts II* Court also "devise[d] a procedure for the implementation of the *Miller* and *Montgomery* decisions in Pennsylvania." *Id.* at 451 (quotations omitted). Specifically, the *Batts II* Court held:

- "[t]he Commonwealth must give [the defendant] reasonable notice of its intention to seek a sentence of life without the possibility of parole," *id.* at 455 and 459;

- there exists "a presumption against sentencing a juvenile offender to life in prison without the possibility of parole;" *id.* at 452;

- "to overcome the presumption against the imposition of a sentence of life without parole for a juvenile offender, the Commonwealth must prove that the juvenile is constitutionally eligible for the sentence beyond a reasonable doubt" (*i.e.*, the Commonwealth must prove, beyond a reasonable doubt, that the defendant "is and forever will be a danger to society" and that the defendant "exhibits such irretrievable depravity that rehabilitation is impossible"); *id.* at 455 (quotations, citations, and emphasis omitted);

- 8 -

- "[t]he Commonwealth's evidence and the sentencing court's decision must take into account the factors announced in **Miller**[1] and section 1102.1(d) of the Crimes Code,[2]" **id.** at 455 n.23 and 459-460;

---

[1] In **Batts I**, the Supreme Court quoted approvingly from this Court's opinion in **Commonwealth v. Knox**, 50 A.3d 732 (Pa. Super. 2012), where we held:

> although **Miller** did not delineate specifically what factors a sentencing court must consider, at a minimum it should consider a juvenile's age at the time of the offense, his diminished culpability and capacity for change, the circumstances of the crime, the extent of his participation in the crime, his family, home and neighborhood environment, his emotional maturity and development, the extent that familial and/or peer pressure may have affected him, his past exposure to violence, his drug and alcohol history, his ability to deal with the police, his capacity to assist his attorney, his mental health history, and his potential for rehabilitation.

**Knox**, 50 A.3d at 745; **see also Batts I**, 66 A.3d at 297; **Batts II**, 163 A.3d at 455 n.23.

[2] 18 Pa.C.S.A. § 1102.1(d) declares:

> **(d) Findings.--**In determining whether to impose a sentence of life without parole under subsection (a), the court shall consider and make findings on the record regarding the following:
>
> (1) The impact of the offense on each victim, including oral and written victim impact statements made or submitted by family members of the victim detailing the physical, psychological and economic effects of the crime on the victim and the victim's family. A victim impact statement may include comment on the sentence of the defendant.
>
> (2) The impact of the offense on the community.
>
> (3) The threat to the safety of the public or any individual posed by the defendant.

- "whether expert testimony is required to rebut the presumption against permanent incorrigibility beyond a reasonable doubt [must] be determined on a case-by-case basis by the sentencing court," *id.* at 456;

- a judge may make the finding of "permanent incorrigibility," *id.*;

- if the evidence is sufficient to support a finding of "permanent incorrigibility" beyond a reasonable doubt, the trial court still has the

---

(4) The nature and circumstances of the offense committed by the defendant.

(5) The degree of the defendant's culpability.

(6) Guidelines for sentencing and resentencing adopted by the Pennsylvania Commission on Sentencing.

(7) Age-related characteristics of the defendant, including:

 (i) Age.

 (ii) Mental capacity.

 (iii) Maturity.

 (iv) The degree of criminal sophistication exhibited by the defendant.

 (v) The nature and extent of any prior delinquent or criminal history, including the success or failure of any previous attempts by the court to rehabilitate the defendant.

 (vi) Probation or institutional reports.

 (vii) Other relevant factors.

18 Pa.C.S.A. § 1102.1(d).

discretion "to impose a life-without-parole sentence or to instead impose a sentence that would allow the juvenile to have an opportunity for parole consideration," *id.* at 457; and,

- "[i]n sentencing a juvenile offender to life with the possibility of parole, traditional sentencing considerations apply. *See* 42 Pa.C.S. § 9721(b). The sentencing court should fashion the minimum term of incarceration using, as guidance, section 1102.1(a) of the Crimes Code," *id.* at 460.

In the end, the *Batts II* Court held that Batts' life-without-parole sentence was illegal, as the evidence was insufficient to support the sentence and the trial court, in fact, concluded that Batts was amenable to rehabilitation. *Id.* at 439.

In the case at bar, Appellant claims that the evidence is insufficient to rebut the presumption against a life-without-parole sentence and that his sentence is, thus, illegal. I agree.

As noted above, our standard and scope of review is as follows:

> we must review the sentencing court's legal conclusion that [a defendant] is eligible to receive a sentence of life without parole pursuant to a *de novo* standard and plenary scope of review. Because this legal conclusion is premised upon the presentation of testimony and the sentencing court's credibility determinations, it presents a mixed question of fact and law. In such circumstances, we defer to the findings of fact made by the sentencing court as long as they are supported by competent evidence, but give no deference to that court's legal conclusions.

*Batts II*, 163 A.3d at 435-436 (citations omitted).

- 11 -

Further, as explained above, the Pennsylvania Supreme Court has recognized "a presumption against the imposition of a sentence of life without parole" for juvenile murderers. To rebut this presumption, the Commonwealth has the burden of proving, beyond a reasonable doubt, that the defendant:

> is entirely unable to change[,] . . . that there is no possibility that [the defendant] could be rehabilitated at any point later in his life, no matter how much time he spends in prison and regardless of the amount of therapeutic interventions he receives, and that the crime committed reflects [the defendant's] true and unchangeable personality and character.

*Id.* at 435.

As everyone agrees, during the resentencing hearing, the Commonwealth presented evidence demonstrating that Appellant has not yet been rehabilitated. Unquestionably, the Commonwealth presented evidence tending to show that, almost since the time Appellant was imprisoned for second-degree murder in 1997, he has engaged in a "consistent pattern of aggressive, defian[t] behavior." N.T. Resentencing Hearing, 12/5/17, at 215 and 263. This behavior includes multiple violations of prison regulations and a variety of criminal acts, such as: Appellant's unprovoked stabbing of a fellow-inmate in the face, which occurred in February 2012; the three times Appellant "squirted a [shampoo] bottle [filled with] urine [and feces]" at

inmates or prison employees, which occurred in 2012, 2014, and 2016; and, Appellant's multiple acts of sexual harassment.[3]

Nevertheless, as everyone also agrees, Appellant is in need of treatment for his mental problems and yet Appellant has rejected all forms of treatment during his time in prison, including therapy and medication. Therefore, this is not a case where all possible forms of treatment were attempted on Appellant and Appellant continued to engage in aggressive and antisocial behavior. Rather, the above-cited evidence merely demonstrates that, **without treatment**, Appellant's aggressive and antisocial behavior has continued unabated.

The above-cited evidence does not satisfy the Commonwealth's burden to establish "that there is no possibility" that Appellant could be rehabilitated. To be sure, since Appellant has not engaged in treatment or attempted to rehabilitate himself, the evidence of Appellant's continued aggressive and antisocial behavior simply does not speak to the question of whether Appellant

---

[3] In **Miller**, the Supreme Court held that a trial court must determine whether, at the time of the crime, the defendant was "permanently incorrigible." **See Miller**, 567 U.S. at 479-480. Nevertheless, in **Montgomery**, the Supreme Court held that a defendant's post-conviction prison conduct was relevant to the issue of whether he is "capable of change." **See Montgomery**, 136 S.Ct. at 736; **see also Batts II**, 163 A.3d at 456 ("**Montgomery** . . . plainly requires a court to consider the post-crime conduct of a defendant in determining whether life without parole is a permissible sentence").

"is entirely unable to change . . . [and] without any hope for rehabilitation." ***Batts II***, 163 A.3d at 435.

In addition, during the remainder of the resentencing hearing, the parties presented no evidence that would tend to show that Appellant's rehabilitation is impossible. Indeed, the Commonwealth's own expert witness (whom the trial court concluded was credible) specifically testified that rehabilitation **was** possible for Appellant.[4]

During the resentencing hearing, Dr. Russell – the Commonwealth's expert witness – testified that Appellant suffers from both antisocial personality disorder and schizotypal personality disorder. N.T. Resentencing Hearing, 12/5/17, at 350. He testified that Appellant's antisocial personality disorder manifests in Appellant's long-line of behaviors and actions that "infringe[] on the rights of others" and that Appellant's schizotypal personality disorder manifests in Appellant's social anxiety, wish to be alone, "odd or peculiar" behaviors and affectations, "unusual perceptions, [] suspiciousness, [and] paranoia;" and "engag[ement] in behaviors and then having a different type of emotional presentation, [such as] smirking while he's doing an obscene or aggressive act." ***Id.*** at 343, 350-351, 353; N.T. Resentencing Hearing, 12/6/17, at 141-142.

---

[4] I note that Appellant's expert witness also testified that Appellant was capable of being rehabilitated. ***See***, ***e.g.***, N.T. Resentencing Hearing, 12/6/17, at 221-222.

While Dr. Russell testified that "there is no cure" for either disorder and that the disorders will "never go[] away," as they are a part of Appellant's personality, Dr. Russell specifically testified that "many of the folks who have [antisocial personality disorder], as they begin to hit their mid-50s, their early 60s, the violent behavior, the frequency of the impulsive aggression you see just stop because of increasing age." N.T. Resentencing Hearing, 12/5/17, at 356. Further, as to Appellant's schizotypal personality disorder, Dr. Russell testified that the personality disorder "can be managed" and that "[w]ith medication and intensive therapy you could begin to assist [a person suffering from schizotypal personality disorder] in making strides to lessen the impact of that personality disorder." N.T. Resentencing Hearing, 12/6/17, at 141-143. Dr. Russell also testified that: "there's certainly a possibility if [Appellant] were to be given a term of years that he could motivate himself to do what's necessary to earn parole;" "if [Appellant] were to be successful outside of a prison system," Appellant would need to consistently comply with his therapy and medication; and, in making a risk assessment of a person, "there is no way you can say that they cannot be rehabilitated or that they will be rehabilitated." *Id.* at 63-64, 149-150; N.T. Resentencing Hearing, 12/5/17, at 354-355.

Therefore, Dr. Russell specifically testified that rehabilitation is not "impossible" for Appellant. Certainly, he testified that it **is possible** for Appellant to be rehabilitated with aging (for his antisocial personality disorder) and with "medication and intensive therapy" (for his schizotypal personality

- 15 -

disorder). Further, and importantly, Dr. Russell testified that if Appellant is one of the "many" individuals for whom aging affects his antisocial personality disorder, it is reasonable to anticipate that "the violent behavior, the frequency of the impulsive aggression **you see just stop** because of increasing age." N.T. Resentencing Hearing, 12/5/17, at 345 (emphasis added).

It is true, Dr. Russell testified, that given Appellant's past behavior, his "refusal to participate and engage" in therapy, and his "refusal to maintain the medication or take the medication," "the risk of [Appellant's] continued aggressive behavior is high." *Id.* at 354-356. However, this testimony does not establish that there is no possibility that Appellant can be rehabilitated – it only establishes that Appellant has not yet chosen to accept or participate in the treatment that might rehabilitate him.

To be sure, the learned majority apparently acknowledges that the Commonwealth's own expert testified that there is a possibility Appellant will age-out of the violence and impulsive aggression associated with his antisocial personality disorder and that it is possible for Appellant to manage his schizotypal personality disorder with medication and therapy. Majority Opinion at **31-34. Nevertheless, the majority still declares that the evidence is sufficient to rebut the presumption against a life-without-parole sentence because "Appellant's aggressive and antisocial behavior [] has not

ceased despite his entering middle age"[5] and Appellant has not yet participated in his necessary mental health treatment. *Id.*; *see also* Majority Opinion at 32 ("[t]here is nothing in the record to indicate that Appellant's psychological disorders will resolve themselves without proper medication and intervention, yet the Commonwealth has shown Appellant ignores therapeutic opportunities and refuses to take medication with regularity").

Respectfully, the majority is not applying the proper standard. We are not here to determine whether Appellant was rehabilitated at the time of the sentencing hearing and we may not attach conditions to make something – that is otherwise possible – impossible. Instead, we must ask whether the Commonwealth proved, beyond a reasonable doubt, that "there is **no**

---

[5] As to this point, the majority declares, in full: "Appellant's aggressive and antisocial behavior has not ceased despite his entering middle age, a time of life the expert testimony has concluded that the frequency of impulsive aggression for many people who have antisocial personality disorder would 'just stop,' according to Dr. Russell." Majority Opinion at *34. However, Dr. Russell did not say this. Rather, Dr. Russell testified that "many of the folks who have [antisocial personality disorder], **as they begin to hit their mid-50s, their early 60s**, the violent behavior, the frequency of the impulsive aggression you see just stop because of increasing age." N.T. Resentencing Hearing, 12/5/17, at 356 (emphasis added). Dr. Russell testified that, since Appellant **is only in his 40s**, there is "[n]o possible way to know right now" whether Appellant is in the category of people whose violence and aggressive impulses subside as they age. N.T. Resentencing Hearing, 12/6/17, at 136. Therefore, contrary to the majority's statement, Dr. Russell did not state that Appellant is at the "time of [his] life" where his violence and impulsive aggression would "just stop" due to age. Instead, Dr. Russell specifically testified that Appellant has not yet reached the age where he could possibly age-out of the violence and impulsive aggression associated with his antisocial personality disorder.

**possibility** that [Appellant] could be rehabilitated **at any point later in his life**, no matter how much time he spends in prison and regardless of the amount of therapeutic interventions he receives." **Batts II**, 163 A.3d at 435 (emphasis added). "Impossibility" in this context equates to a zero percent chance of occurrence – and, as explained in more detail above, the Commonwealth simply did not satisfy its burden of production in this case. Certainly, the Commonwealth's own expert testified that rehabilitation for Appellant **is possible**.

On May 20, 1994, Appellant murdered Raymond McKinley in a senseless and reprehensible act of violence. While in prison for this murder, Appellant engaged in a "consistent pattern of aggressive, defian[t] behavior" and committed many violent and appalling acts. Nevertheless, it is undisputed that Appellant may benefit from mental health treatment and that Appellant has yet to agree to this treatment. Thus, the Commonwealth's evidence of Appellant's continued aggressive and antisocial behavior merely establishes that Appellant has not yet been rehabilitated. The evidence simply does not establish that Appellant "is one of the very rare individuals who is **incapable** of rehabilitation" or that "there is **no possibility** that [Appellant] could be rehabilitated at any point later in his life, no matter how much time he spends in prison and regardless of the amount of therapeutic interventions he receives." **See Batts II**, 163 A.3d at 435 and 454 (emphasis added). Indeed, the Commonwealth's own expert testified that it is possible for Appellant to be rehabilitated with medication and therapy and for Appellant's violent acts

and impulsive aggression to "just stop" in the future because of increasing age.

I thus conclude that the evidence is insufficient to rebut the presumption against the imposition of a sentence of life without parole and that Appellant's sentence is illegal. Therefore, I would vacate Appellant's judgment of sentence and remand for resentencing.[6,7]

_____

[6] Given my belief that the evidence is insufficient to rebut the presumption against the imposition of a sentence of life without parole, I will not discuss Appellant's remaining issues, as they are moot.

[7] I note that, even with the possibility of parole, Appellant may never be paroled if he fails to be rehabilitated. As the High Court made clear,

> Extending parole eligibility to juvenile offenders does not impose an onerous burden on the States, nor does it disturb the finality of state convictions. Those prisoners who have shown an inability to reform will continue to serve life sentences. The opportunity for release will be afforded to those who demonstrate the truth of **Miller's** central intuition – that children who commit even heinous crimes are capable of change.

**Montgomery**, 136 S.Ct. at 736.